760 P.2d 1245 (1988)
Mills LANE, District Attorney For Washoe County, Petitioner,
v.
SECOND JUDICIAL DISTRICT COURT, WASHOE COUNTY, The Honorable Robert L. Schouweiler, District Judge, and The Honorable Robin Wright, District Judge, Respondents.
No. 18768.
Supreme Court of Nevada.
August 29, 1988.
Mills Lane, Dist. Atty., and Gregory R. Shannon, Deputy Dist. Atty., Reno, for petitioner.
Robert L. Schouweiler, Dist. Judge, Second Judicial Dist. Court, Washoe County, Reno, for respondents.

OPINION
SPRINGER, Justice:
This original petition for a writ of prohibition challenges an order of the district court enjoining the Washoe County District Attorney from proceeding further with a criminal matter, and designating an investigator or so-called "special prosecutor" to evaluate the case for possible resubmission to the grand jury. On February 22, 1988, this court entered an order denying extraordinary relief, concluding that petitioner failed to demonstrate that the respondent district court acted arbitrarily or capriciously in the exercise of its discretion, or that it otherwise exceeded its jurisdiction. Petitioner has now petitioned for rehearing or reconsideration of our order, contending that this court overlooked two material matters and requesting further consideration of an argument previously raised. The petition for rehearing is opposed. Upon thorough review of the contentions of the parties, and of the record now before us, we conclude:
(1) The district attorney is inappropriately seeking to raise points never properly raised by his original petition to this court, and to reargue points fully considered in our original order;
(2) In any case, the district attorney is incorrect in his contention that he is vested with the sole right to control the processes of the grand jury, to the exclusion of District *1246 Court Judge Robert L. Schouweiler, who impaneled the grand jury, and to the exclusion of Chief Judge Robin A. Wright, who joined with Judge Schouweiler in entering the order challenged in these proceedings;
(3) The respondent judges' determination is well founded that complaints tendered to the district court by victims of alleged sexual assaults, and by two investigating officers of the Washoe County Sheriff's Department, warrant judicial inquiry, by virtue of the following:
(a) The record reflects without contradiction that the district attorney's deputy who presented the case to the grand jury did so in a manner that, as a natural consequence, precluded the grand jury from knowing about or considering the testimony of the investigatory officers;
(b) In presenting the case to the grand jury, the district attorney's deputy also depreciated the prosecution's case by multiple violations before the grand jury of Nevada's "rape shield law," NRS 50.090 and 48.069; and
(c) The district attorney's deputy depreciated and prejudiced the prosecution's case by the introduction of hearsay testimony which, as a natural and apparently intended consequence, diminished the credibility of the complaining witnesses.
Nonetheless, in our view, an inference does not inexorably follow that the district attorney himself, Mills Lane, was a blameworthy participant in the prosecutorial omissions mentioned above. Consequently, before the respondent judges took action to appoint a special investigator or "prosecutor" to collect further data in the district attorney's place and stead, we believe they should have accorded the district attorney notice and an opportunity to be heard concerning the prior failures of the prosecution and as to whether the district attorney's office will proceed properly with the case in the future. Although petitioner's claim that he did not receive proper notice has been raised belatedly, for the first time on rehearing, we have considered the matter in the interests of reaching a correct and speedy disposition. Accordingly, we grant rehearing and a writ of prohibition directing that the inquiry ordered below shall not proceed until a hearing on notice to the district attorney has been conducted before the district court, affording the district attorney an opportunity to be heard as aforesaid.

FACTS
In the early morning hours of February 22, 1986, two young women, referred to hereafter as Jane and Mary, visited Nye Hall, a coeducational dormitory on the campus of the University of Nevada at Reno (UNR).[1] During that visit, four young men, three of whom were members of the UNR football team, allegedly engaged in nonconsensual sexual acts with the young women. Jane and Mary did not immediately complain to the police. Several days after the incident, however, Jane allegedly continued to experience pelvic pain. Both women then visited the hospital and were examined by physicians. The police were notified of the incident at this time. Washoe County Sheriff's Deputies Putnam and Jenkins assisted the university police in investigating the complaints of the two women. The officers took statements from the four suspects involved, administered certain tests, and recorded the results of these tests and interviews. As a result of their investigation, it appears that the officers obtained certain data, some of which they regarded as admissions or confessions.[2]
Following their investigation, the officers felt that the evidence, including the confessions *1247 or admissions, justified charges against the men for sexual assault. The officers' supervisor agreed, and the evidence was submitted to the Washoe County District Attorney for presentation to the grand jury.
The deputy district attorney scheduled grand jury time for this presentation on two dates, March 26, 1986, and April 10, 1986, to accommodate all witnesses whose testimony he felt would be necessary to present. The proposed indictments of the suspects, however, listed only four witnesses  the complainants and two friends of the suspects. The investigating officers were not listed as witnesses, although they were subpoenaed to testify.
According to the grand jury transcript of March 26th, at the outset of the presentation of evidence, the deputy district attorney told the grand jurors, "[t]his is ... a rather unusual proceeding in that we anticipate a break ... and I think you will see why that break is necessary." He then presented to the grand jury the testimony of the two alleged victims, after which he requested that the grand jurors take a break. Following this break, the deputy district attorney called "Roe," a friend of the suspects, to testify. This "witness," a fellow member of the UNR football team, testified that he had spent the weekend in question out of town and that he had learned about the incident from others during the following week. He then indicated to the grand jurors his opinion, based on a conversation with Mary and their past relationship, that Mary had in fact consented to the sexual acts of which she later complained:
DEPUTY D.A.: After the police talked to you, [Mary] called you?
ROE: That night she called me saying ... she felt she owed me an explanation of what had happened. I told her she didn't owe me anything. And I did inquire about it, asked her "Why are you guys lying about this and trying to get ... all them in trouble?"
DEPUTY D.A.: What did she say?
ROE: She said it  I said "Why are you lying about and saying they raped you?" Was my direct statement. She said "They did not rape us. I feel they took advantage of us."
DEPUTY D.A.: "They took advantage of us?"
ROE: That is what she said.
DEPUTY D.A.: Did you have any other discussion with either [Jane] or [Mary] about this situation?
ROE: No, I have not.
DEPUTY D.A.: You haven't had any other meetings with [Mary] on any subject.
ROE: No. But when I asked her on the phone, I asked her "Why are you lying about this and trying to get them in trouble?" She wouldn't answer me. I felt, you know 
DEPUTY D.A.: That is when she said "They were taking advantage of us?"
ROE: Yeah. In my mind I felt that, you know, I knew there wasn't any wrongdoing.
DEPUTY D.A.: How did you know?
ROE: From 
DEPUTY D.A.: The way you feel?
ROE: My feelings there wasn't any wrong doings. From my past experiences with [Mary], I know how she is and I didn't want to further the conversation any.
Following this testimony, the deputy district attorney indicated to the grand jurors that no more time was scheduled on that day for their consideration of the case:
Mr. Foreman, looking at the schedule we have gone way beyond our allotted time. There are several other witnesses who have been subpoenaed to testify and I would leave it to the Grand Jury to decide whether you want to deliberate at this point in time to the conclusion of a no true bill or true bill or desire to hear those other witnesses who will be made available to you in two weeks.
The transcript indicates that the grand jury then met privately to consider whether to *1248 proceed. The deputy district attorney then stated for the record:
Before we proceed, Mr. Foreman, you asked the reporter and I [sic] to leave the room at the end of the last witness' testimony when we indicated we were pretty much out of time. You have since asked me to have Mr. [Doe] who was here present and ready to testify and you wish to continue with that with our investigation... .
Accordingly, the deputy district attorney presented Mr. Doe, the last witness endorsed on the proposed indictment. Doe, a friend of the suspects, testified that he was in the suspects' dormitory room on the night in question, that the two complainants were apparently intoxicated, and that he left before the alleged incidents occurred when an argument ensued between Jane and one of the suspects. The deputy district attorney then permitted this witness to testify in response to the following questions of a grand juror concerning rumors Doe had heard about the complainants' reputations, and concerning Doe's belief that the women had consented to the sexual acts:
A GRAND JUROR: Did you hear any talk that would lead you to any sort of conclusion in your own mind as to whether either of these girls resisted or didn't want this to happen?
DOE: No, I did not.

A GRAND JUROR: Did you hear any talk that would indicate that they did want it to happen?
.....
DOE: Somewhat, because they came around and, you know, it really wasn't any talk, you know, they wanted to have it, you know. You know. It wasn't a plan. It was nothing like that. No one  you know, it wasn't like they wanted it to happen or they didn't want it to happen. I guess it just happened. It wasn't nothing like that.
A GRAND JUROR: You said [Mary] made a statement to you you didn't  you shouldn't mess with the person who gives the best head in Reno?
DOE: Yeah.
A GRAND JUROR: What was your impression about her then I mean?
DOE: I had heard rumors about her.
A GRAND JUROR: Was it just because she was intoxicated, this girl was drunk?
DOE: I just thought she wanted, you know.

A GRAND JUROR: No biggie?
DOE: I didn't think nothing of it. I just thought they were like that.
DEPUTY D.A.: Did you think it was like a drunk girl talking or being real serious or what?
DOE: Yeah. I just thought they were like that, the girls were like that period, drunk, or that is the impression they left me.
DEPUTY D.A.: You didn't know them before, don't know them since?
DOE: I never knew them. Just their reputation.

A GRAND JUROR: When you talk about their reputation, is this something you had heard before that evening?
DOE: Oh, I had heard it around last semester about them, you know. But I never really took it, you know, because I never said anything to them. I just seen them. I never talked to them.
A GRAND JUROR: Did you hear the reputation around the guys?
DOE: The campus.
A GRAND JUROR: Or was it the campus? I am trying to specify. Was it a mixed group of females or just males talking?
DOE: It was everyone in Nye. Male and female knew about these girls.
(Emphasis added.) During this testimony, the foreman of the grand jury commented upon the relevance of the complainants' reputations to the proceeding: "Mr. [deputy *1249 district attorney], I don't know, their reputation isn't a factor." Rather than answering the foreman's inquiry, the deputy district attorney replied only that:
The legal question here today is the strict thing that is laid out in the proposed Indictment, whether or not on this occasion they had sexual relations with each  the individual persons that are named in the particular counts against the will of the woman and whether that lack of consent was communicated to the perpetrator.
Although the investigating officers had been subpoenaed and were available to testify at the proceeding, the deputy district attorney then falsely informed the grand jury that "I don't know there are any other witnesses here available to testify, although I do know there are some that have been proposed by the defendants' attorneys who can bring evidence to the Grand Jury." The foreman then asked the deputy district attorney if the suspects wished to testify. In an affidavit submitted to this court in support of the petition for rehearing, the deputy district attorney states that all four suspects wished to testify and were available.[3] In contradiction of this, however, the deputy district attorney responded to the foreman's question as follows:
DEPUTY D.A.: They have been invited to testify. One of them has indicated ... he does desire to testify. And I am not sure as to any of the other defendants. Whether or not they testify of course cannot be held against them if they decide not to testify.
Further, when the foreman asked the deputy district attorney whether the suspect who had indicated he wished to testify was present, the deputy district attorney indicated, "I am not sure. I will check." That suspect, who was not listed on the proposed indictments as an intended witness, then testified. During the course of the testimony of the suspect relating his version of the incident in question, the deputy district attorney permitted him to recount to the grand jury an alleged prior sexual encounter with Jane:
A GRAND JUROR: You said the girls had been there before on other occasions. Did you and your roommate or any of the other guys have sex with them?
THE WITNESS: I have sir. I had sex with [Jane] once, sir, and she gave me oral copulation one time before because she was on her period.
At no time did the deputy district attorney inform the grand jurors either that the investigating officers were available to testify or that their investigation generated eight exhibits.[4] In his affidavit filed in this court, the deputy district attorney explains his reasons for not calling the officers: "[T]he testimony of [this suspect] ... was not inconsistent with his statements to law enforcement officers.... It was your affiant's intention to present these witnesses if the targets of the Grand Jury testified inconsistently with the statements they had given these officers." (This explanation, of course, totally obscures and fails to address the experienced investigating officers' representations that the statements constituted incriminating confessions or admissions.) Following presentation of the testimony set forth above, the deputy district attorney told the grand jury:
Again, Mr. Foreman, we are severely behind the schedule. I know Miss Zuppan is going to kill me, but there are *1250 other potential witnesses available. I don't know what the Grand Jury's pleasure is at this point in time. I don't know they are able to testify at this point.[5]
The foreman then requested a moment of privacy with the grand jury, and the deputy district attorney and the court reporter were excluded from the grand jury room. The transcript of the grand jury proceeding ends at this point; hence, the record does not support the deputy district attorney's representation that the grand jury "refused" to hear more witnesses. Following their conference, the grand jury returned a "no true bill," and thus declined to indict the suspects based upon the evidence they had heard.
When the sheriff's deputies realized that the grand jury reached its decision without hearing testimony and other evidence relating to their investigation, they immediately complained to their supervisor. Eventually, the officers tendered their information to respondent Judge Schouweiler, who made the officers' complaints known to respondent Judge Wright.[6] Further, one or both of the two complainants also visited Judge Schouweiler, and Mary provided him with an affidavit which reflected her belief that there existed confessions of the suspects which had not been presented to the grand jury. Although Judge Schouweiler attempted to obtain the transcript of the grand jury proceeding, it was not delivered to Judge Schouweiler upon his request.[7] Consequently, confronted with the complaints of the officers and the alleged victims, and unable to review the transcript of the challenged proceeding, on February 12, 1988, the respondent judges issued an order appointing attorney Paul Elcano to collect the data necessary to determine whether resubmission of the matter to a new grand jury would be appropriate, and restraining the Washoe County District Attorney from proceeding further in the case due to perceived irregularities in the presentation of the case to the grand jury.
Petitioner, Washoe County District Attorney Mills Lane, then filed in this court a petition for a writ of prohibition, requesting that the respondent district court judges be prohibited from intervening in the case. The petition was not, however, verified by petitioner Lane or his deputy. See NRS 34.330 (writ is issued only upon affidavit, on the application of the person beneficially interested); NRS 15.010(1) (verification by petitioner's attorney appropriate under certain circumstances). Additionally, the petition was not properly documented with a copy of the grand jury *1251 transcript as required by NRAP 21(a).[8]
On February 22, 1988, this court entered an order noting the procedural derelictions and denying the petition on the merits. Petitioner subsequently filed a petition for reconsideration or rehearing on February 26, 1988. Prior to the filing of that petition, however, on February 18, 1988, Judge Schouweiler issued a supplemental order in the proceeding below. This supplemental order is designated "sealed," and indicates that the review by respondent Judge Schouweiler of the grand jury transcript supports his earlier conclusion that a special investigation is warranted. Specifically, respondent Judge Schouweiler notes in the supplemental order that the admissions or confessions of the suspect who testified before the grand jury should have been presented in order to impeach his testimony. Judge Schouweiler also states that the grand jury transcript does not disclose that the deputy district attorney informed the grand jury of the existence of the confessions and admissions, or that the investigating officers were subpoenaed to present them. Thus, respondent Judge Schouweiler concludes that the transcript "fails to support the District Attorney's media allegations that the confessions were not presented because the Grand Jury told the District Attorney it did not want to hear any more testimony." Judge Schouweiler also opines that "one inference that can be drawn is that the District Attorney did not want to present the confessions and took several opportunities to suggest to the Grand Jury that it begin deliberating." The district judge further notes in this order that the transcript reveals violations of Nevada's rape shield law, see NRS 48.069 and 50.090, during the grand jury proceeding.[9]

SUPERVISION OF GRAND JURY
In his original petition for extraordinary relief, petitioner primarily contended that the district court's order violated the doctrine of separation of powers. Specifically, petitioner contended that only he, as the representative of the executive branch of the government, may conduct prosecutions on behalf of the people, and that, therefore, the challenged order constituted "an unconstitutional infringement of the judiciary on executive powers." In rejecting this contention, this court noted that the office of the district attorney is not an office created by the Nevada State Constitution. Rather, the district attorney's duties and powers are prescribed by the legislature and are statutorily defined in NRS 252.110. Consequently, we concluded that the doctrine of separation of powers is inapplicable.
Further, we noted that control of the grand jury's functions is not vested in the district attorney or his office and that the grand jury should function independently of the prosecution. The grand jury performs as an adjunct to the judicial branch of the government and, as such, is not integrated within the executive branch. Significantly, NRS 172.097(1) expressly provides that "[t]he district judge impaneling a grand jury shall supervise its proceedings." See also NRS 172.047. Thus, our order concluded that, even under the concept of separation of powers, the supervision of the grand jury is committed to the judicial branch of the government. As this court has previously stated in a case involving the Washoe County District Attorney's Office:
Grand juries have traditionally been within the control of the courts, In re Grand Jury Subpoena to Central *1252 States, 225 F. Supp. 923 (N.D.Ill. 1964); In re Ormsby Grand Jury, 74 Nev. 80, 322 P.2d 1099 (1958); and the trial judge should exercise his powers when appropriate. United States v. Doulin, 538 F.2d 466 (2d Cir.1976), cert. denied, 429 U.S. 895 [97 S.Ct. 256, 50 L.Ed.2d 178]. Moreover, our constitutional and statutory scheme contemplate reasonable judicial control of our grand juries. Thus, the court presides at the impanellment of the grand jury (Art. 6, § 5, Nev. Const.; NRS 6.110-140), receives presentments and indictments (Art. 6, § 5, Nev. Const.; NRS 172.255, 172.285), determines when a grand jury shall be impanelled (NRS 6.110, 6.130), charges the grand jury as to its authorities and responsibilities (NRS 172.095), and determines when a grand jury is to be discharged, recessed (NRS 6.145), or a juror excused (NRS 172.275).
In re Report Washoe Co. Grand Jury, 95 Nev. 121, 126-27, 590 P.2d 622, 625-26 (1979) (emphasis added). Thus, we concluded that the district court had not undertaken review or supervision of the performance of the grand jury that exceeded its jurisdiction or infringed upon powers exclusive to the executive branch of government.
We also rejected petitioner's argument that the district court lacks jurisdiction to disqualify a prosecutor prior to the filing of a charging document in a criminal matter and to appoint a special prosecutor. As we noted in our order, NRS 252.100(1) specifically provides, in relevant part:
If the district attorney ... for any reason is disqualified from acting in any matter coming before the court, the court may appoint some other person to perform the duties of the district attorney... .
Indeed, courts in other jurisdictions have recognized that, in exercising its supervisory powers over grand jury proceedings, a trial court "may order the disqualification of attorneys attending the grand jury where the integrity of the grand jury process and the proper administration of justice require it." See Amemiya v. Sapienza, 63 Haw. 424, 629 P.2d 1126, 1129 (1981) (quoting Sapienza v. Hayashi, 57 Haw. 289, 554 P.2d 1131 (1976)). In the absence of countervailing authority, we think that a district attorney may be disqualified if a court, in the exercise of its supervisory powers over the grand jury, determines there is a prospect that the district attorney has not properly pursued his prosecutorial functions.[10]
On rehearing, petitioner urges this court to consider further certain aspects of the separation of powers argument raised in his original petition. Specifically, petitioner states that he
agrees that based upon the specific statutory and case citations in that Opinion [In re Report Washoe Co. Grand Jury, supra] that while the courts have those specific supervisory functions they do not retain or supervise the District Attorney or Attorney General presentations to the Grand Jury. There is no citation to either statute or case law which allows the judiciary to make the evidentiary presentation to the Grand Jury, to have the Court's agent make the presentation to the Grand Jury or to retain any control over which witnesses or what evidence will be presented prior to the case actually being presented to the Grand Jury.
Petitioner further contends that, should the district attorney refuse to resubmit this matter to the grand jury, under NRS 173.065 the prosecutorial responsibility for the case remains with the executive branch rather than with a "special prosecutor" selected by the district court.
As we have stated many times, matters previously presented to this court may not *1253 be reargued in a petition for rehearing. See NRAP 40(c)(1); In re Herrmann, 100 Nev. 149, 151, 679 P.2d 246, 247 (1984). Petitioner is therefore improperly raising this issue for a second time before this court. In any event, we have reviewed petitioner's argument on rehearing and conclude that further consideration of his separation of powers argument is unwarranted.
First, respondents are not attempting to supervise the district attorney's presentation to the grand jury. They merely appointed an independent attorney to conduct an investigation to determine whether the case should be resubmitted to the grand jury. Neither are respondents making the evidentiary presentation to the grand jury, or controlling the witnesses or evidence to be presented. Likewise, the district court's agent is not presenting the case to the grand jury, but simply investigating whether the matter should be resubmitted to the grand jury.
Additionally, the district court's supervisory powers are not as limited as petitioner suggests. Its powers over the grand jury extend beyond those declared specifically by statute:
A grand jury has no existence aside from the court which calls it into existence and upon which it is attending. A grand jury does not become, after it is summoned, impaneled, and sworn, an independent planet, as it were, in the judicial system, but still remains an appendage of the court on which it is attending... . It is and remains a grand jury attending on the court, and does not, after it is organized, become an independent body, functioning at its uncontrolled will, or the will of the district attorney or special assistant... . A supervisory duty, not only exists, but is imposed upon the court, to see that its grand jury and its process are not abused, or used for purposes of oppression and injustice.
People v. Sears, 49 Ill.2d 14, 273 N.E.2d 380, 387-88 (1971) (quoting In re National Window Glass Workers, 287 F. 219 (N.D. Ohio 1922)); see also Annotation, Power of Court to Control Evidence or Witnesses Going Before Grand Jury, 52 A.L.R.3d 1316 (1973).
Further, NRS 173.065 does not support petitioner's argument that the attorney general, rather than a "special prosecutor," should resubmit a case to the grand jury when the district attorney refuses to do so. That statute provides for the appointment of the attorney general in the district attorney's place when the district attorney refuses to prosecute a person who has committed a crime.[11] As noted in our order denying extraordinary relief, it might well be appropriate that the attorney general perform the function of alternate prosecutor following the return of any indictments. At this point in time, however, no indictments have been filed and, accordingly, a "prosecution" has not begun. See Ryan v. District Court, 88 Nev. 638, 503 P.2d 842 (1972) (prosecution of a case does not begin until after charges are filed). Hence, petitioner's concern in this regard is premature.
Similarly, we reject petitioner's contention that respondents have no authority to require the special prosecutor to report to respondent Judge Schouweiler prior to resubmitting the case to the grand jury. NRS 172.255(4) requires the district court to approve the resubmission of a matter to the grand jury if a grand jury has previously refused to indict on the same charges.

GRAND JURY PROCEEDINGS
Petitioner next argues that rehearing is warranted because we overlooked the request in his original petition that this court inspect the grand jury transcript. He contends that a review of this transcript will establish that there was no irregularity in *1254 the presentation of the case. As noted above, in contravention of NRAP 21(a), a copy of this transcript was not appended to the writ petition. Nonetheless, we have now reviewed the grand jury transcript. We adhere to our prior determination that petitioner failed to demonstrate that the district court acted arbitrarily or capriciously in determining that a judicial inquiry is warranted into the presentation of the case to the grand jury.

A. Withholding of Inculpatory Evidence
First, our review of the grand jury transcript reveals sufficient evidence to support the district court's determination that the deputy district attorney may have withheld inculpatory evidence from the grand jury. The transcript of the grand jury presentation reveals that the deputy district attorney handled the presentation in such a manner that the results of the sheriff department's investigation were never revealed. Indeed, the deputy district attorney not only failed to list the investigating officers as witnesses on the proposed indictments, he also failed to inform the grand jury that they were present to testify on March 26th. Additionally, the grand jurors were never made aware of the existence of the eight exhibits generated as a result of the investigation or that the suspects gave allegedly incriminating statements to law enforcement officials. It does not, as petitioner argues, appear from the transcript that the grand jurors "refused" to hear more testimony. Rather, it appears from the transcript that the proceedings ended due to the deputy district attorney's repeated references to scheduling pressures and to his "doubts" about the availability of witnesses or the suspects to testify. The deputy district attorney's suggestion that the grand jury take a break during the presentation of the case, despite the time pressures, is particularly troubling. It is not apparent why he wanted the grand jury to break, and we query whether he was creating the time shortage of which he repeatedly complained. The prosecutor is under a duty not to inflame or otherwise improperly influence the grand jury's ability to evaluate the evidence independently and impartially. See Sheriff v. Frank, 103 Nev. 160, 734 P.2d 1241 (1987). As this court stated in Franklin v. State, 89 Nev. 382, 386, 513 P.2d 1252, 1255 (1973):
In presenting a case to a grand jury a prosecutor . .. must scrupulously refrain from words or conduct that will invade the province of the grand jury or tend to influence the jurors in their judgment.
The deputy district attorney's conduct before the grand jury is therefore clearly a matter of legitimate concern, and validates the conclusion of the district court that the case had not been properly presented.

B. Violation of Rape Shield Law
It also appears from the transcript that the deputy district attorney presented improper evidence to the grand jury of the complainants' asserted reputations for promiscuity and specific instances of their prior sexual encounters in violation of NRS 172.135(2) and Nevada's rape shield law. "The grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence." NRS 172.135(2). In 1975, Nevada, joining the vast majority of jurisdictions, passed statutes limiting the admissibility at trial of evidence concerning the sexual history of a complaining witness in a rape or sexual assault case. To this end, NRS 50.090 prohibits the accused from impeaching a rape victim's credibility with evidence of her prior sexual conduct, unless the victim has testified regarding her sexual history or the prosecution has presented evidence regarding the victim's prior sexual conduct.[12] NRS 48.069 further prohibits the accused from introducing such evidence *1255 to prove the victim's consent unless the procedures set forth in that statute are followed.[13] NRS 48.069 contemplates that before admitting any evidence of prior sexual conduct the district court will conduct a hearing, based upon the accused's specific written offer of proof, and determine whether the evidence is relevant to the issue of consent and whether it is of sufficient probative value to outweigh the danger of unfair prejudice, of confusion of the issues, and of misleading the jury. NRS 50.090 and 48.069 expressly limit the admission of such evidence to prosecutions. Because prosecution of a case does not exist until charges are filed, see Ryan v. District Court, 88 Nev. 638, 503 P.2d 842 (1972), evidence of prior sexual conduct is not admissible under NRS 48.069 and 50.090, and cannot become legal evidence within the meaning of NRS 172.135(2), until on motion a district court rules it to be such following the return of the indictment. See NRS 172.005. Consequently, this evidence is inadmissible before the grand jury.
Nevada's rape shield law recognizes that there may be no relationship between prior sexual conduct and the victim's ability to relate the truth, and that whether a victim has previously consented to sexual activity under different circumstances may have little or no relevance to the issue of her consent to the activities which resulted in the rape prosecution. Moreover, the rape shield law acknowledges that such evidence tends to distract and inflame the jury and carries with it the danger of unduly prejudicing the truthfinding process. See Summitt v. State, 101 Nev. 159, 163, 697 P.2d 1374, 1377 (1985); State v. Hudlow, 99 Wash.2d 1, 659 P.2d 514 (1983); People v. McKenna, 196 Colo. 367, 585 P.2d 275 (1978); Comment, Evidence  Admissibility of the Victim's Past Sexual Behavior Under Washington's Rape Evidence Law  Wash. Rev. Code § 9.79.150 (1976), 52 Wash.L.Rev. 1011, 1033 (1977). As Justice John Mowbray recently explained,
Such [rape shield] laws have generally been designed to reverse the common law rule applicable in rape cases, that use of evidence of a female complainant's general reputation for morality and chastity was admissible to infer consent and also to attack credibility generally. Thus, for example, it had been held: "It is a matter of common knowledge that the bad character of a man for chastity does not even in the remotest degree affect his character for truth, when *1256 based upon that alone, while it does that of a woman." State v. Sibley [131 Mo. 519, 132 Mo. 102] 33 S.W. 167, 171 (1895), quoted in State v. Brown, 636 S.W.2d 929, 933 n. 3 (Mo. 1982), cert. denied sub nom., Brown v. Missouri [459 U.S. 1212] 103 S.Ct. 1207 [75 L.Ed.2d 448] (1983). Such statutes as Nevada's have been described as "directed at the misuse of prior sexual conduct evidence based on this antiquated and obviously illogical premise." State v. Hudlow [99 Wash.2d 1] 659 P.2d 514, 519 (1983). See also People v. McKenna, [196 Colo. 367] 585 P.2d 275, 278 (1978). An additional purpose of such statutes is "`to protect rape victims from degrading and embarrassing disclosure of intimate details about their private lives.'" 124 Cong.Rec. at H 11945 (1978), quoted in Doe v. United States, 666 F.2d 43, 45 (4th Cir.1981). Finally, "[t]he restrictions placed on the admissibility of certain evidence by the rape-shield laws will, it was hoped, encourage rape victims to come forward and report the crimes and testify in court protected from unnecessary indignities and needless probing into their respective sexual histories." State v. Lemon, 456 A.2d 261, 264 (R.I. 1983).
Summitt v. State, 101 Nev. at 161, 697 P.2d at 1375.
In light of the questionable relevance of this evidence and its distracting and inflammatory nature, the policies underlying Nevada's rape shield law would be defeated if, in grand jury proceedings, evidence regarding the victim's prior sexual acts or reputation for promiscuity is disclosed. If deputy district attorneys are allowed to present such evidence before grand juries, while as here the complaining witnesses are afforded no chance to explain or deny, it is likely few, if any, indictments would be returned. The presentation to the grand jury of such potentially prejudicial evidence could result in an inability to institute prosecution of a crime, due to evidence that might well later have been ruled inadmissible at trial. In such circumstances, the complaining witness would be denied the opportunity to prosecute an attacker due to untested use of the complainant's asserted reputation and purported prior sexual encounters, and without regard to the particular facts and circumstances of the alleged sexual assault.
In the present case, the deputy district attorney first elicited testimony from Jane that she had previously been involved in a "romantic relationship" with one of the suspects, and from Mary that she also had a prior "romantic relationship" with Roe, the friend of the suspects who testified immediately following the grand jury's break. Although the complainants had testified only to a romantic relationship with these men, the deputy district attorney later questioned, or permitted the grand jury to question, the suspect and Roe about whether they had previously engaged in sexual relations with the women. Further, the deputy district attorney permitted the suspect to testify concerning Mary's previous refusal to have sex with one of the other suspects. Although the four suspected participants in the crimes were willing and available to testify, the deputy district attorney presented the opinion testimony of Doe and Roe, two persons absent at the time of the alleged assaults, that the complainants consented to the sexual acts. Despite the obviously prejudicial nature of such testimony, the deputy district attorney also permitted Doe, who had never met the complainants prior to the evening in question, to testify as to the complainants' alleged reputations for promiscuity. The deputy district attorney, by elicting such testimony, permitted the grand jury to receive evidence of prior sexual conduct in violation of the rape shield law and NRS 172.135(2).
This case highlights the need to apply such controls on this type of evidence to presentations before the grand jury. Violation of the rape shield law may well have compromised the grand jury's ability to evaluate the evidence independently and impartially in the instant case. The grand jurors themselves elicited Doe's account of *1257 the complainants' reputations, and inquired of the suspect whether he, his roommate or "any of the other guys" had previous sexual relations with the two women. Moreover, the deputy district attorney, to what legitimate end is unknown to this court, also posed questions relating to the alleged victims' prior sexual conduct. The transcript indicates that this evidence confused the issues and misled the grand jury. Yet, when the foreman questioned the relevance of this evidence, the deputy district attorney did nothing to dissipate the grand jury's perplexity, but simply reiterated that: "The legal question here today is the strict thing that is laid out in the proposed Indictment... ."
Finally, we reject petitioner's contention that his deputy was required to present such evidence by virtue of NRS 172.145 because of its exculpatory nature.[14] Evidence of prior sexual conduct is not identified as exculpatory evidence until after the accused submits the issue of consent to the court and the court determines, after a hearing on the matter, that the evidence is more probative than prejudicial. See NRS 48.069.[15]

C. Hearsay Diminishing Victims' Credibility
As noted above, "[t]he grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence." NRS 172.135(2). The opinion testimony of two individuals, who were not present at the time of the alleged sexual assault, that the complainants consented to the acts was neither legal nor the best evidence. NRS 50.025 provides that to be competent to testify, a witness must have personal knowledge of the subject of his testimony. Thus, the two witnesses called by the deputy district attorney, who were not present at the time in question, were incompetent to testify as to the alleged victims' consent. Additionally, the four suspected participants in the crimes who had personal knowledge of the events were willing and available to testify. If the prosecutor felt compelled to present evidence of the complainants' consent, opinion testimony of two persons absent at the time of the alleged assaults was not the best evidence available. Further, as noted above, this opinion evidence, as well as the testimony regarding the complainants' reputations in general for promiscuity and prior sexual conduct, was highly inflammatory, and for the most part, hearsay evidence. As such, it was presented to the grand jury in violation of NRS 172.135.

NOTICE AND OPPORTUNITY TO BE HEARD
The original petition for a writ of prohibition complained that respondents entered the order appointing a special prosecutor "without any prior notice to the Washoe County District Attorney's Office that there was an Order being prepared or even that the Court was conducting an investigation," and that respondents "failed to give the District Attorney any notice or opportunity to be heard in the matter... ." Although the original petition contained these statements, it set forth absolutely no legal authority demonstrating that a district attorney is entitled to notice and an opportunity to be heard prior to being enjoined from investigating a particular case. Although affidavits executed by the petitioner and the deputy district attorney vaguely alluded to notions of procedural due process, these concepts were not developed elsewhere in the petition or supported by *1258 any points and authorities. It did not, therefore, appear that petitioner was tendering this issue to this court, as petitioner made no effort whatsoever to support the statements quoted above. Thus, due to the dearth of authority presented by petitioner to support the statements regarding notice and opportunity to be heard, this court did not address the merits of those statements. See, e.g., Franklin v. State, 89 Nev. 382, 386, 513 P.2d 1252, 1255 (1973). Although petitioner has now tendered this issue on rehearing, because this argument is now briefed for the first time in a petition for reconsideration, we would not ordinarily grant a rehearing of our previous determination that extraordinary relief is not warranted.[16]See NRAP 40(c)(1). Nevertheless, in the instant case, in the interest of moving toward a correct resolution of this matter, we will address the arguments that petitioner now presents for the first time.
Petitioner contends that he is entitled to notice and an evidentiary hearing before the district court can disqualify the district attorney's office from prosecuting a case. In opposition, respondent states that the "special prosecutor" was intended to function as a "special investigator for the Court" charged with the narrow duty of evaluating the case for possible resubmission to the grand jury. He argues that the district attorney was not disqualified from resubmitting the matter to the grand jury, and therefore was not entitled to notice and a hearing prior to the appointment of the "special prosecutor." Consequently, it appears that the district court merely enjoined petitioner from acting during Elcano's investigation and did not "disqualify" petitioner from prosecuting the case. In either event, however, under the circumstances of this case, we conclude that the district court should have afforded the district attorney notice and an opportunity to be heard prior to the appointment of this investigator.
As noted above, the district court, in the exercise of its supervisory powers over the grand jury, has authority to displace a district attorney where it appears that the district attorney has not properly pursued his prosecutorial functions. In the instant case, it does not inexorably appear on the face of the record that the district attorney was a blameworthy participant in the prosecutorial omissions. The record reveals that it was the deputy district attorney who presented the case to the grand jury and who committed the improprieties discussed above. On the other hand, the district attorney, at the time the orders were entered, was not actively pursuing the prosecution of this case below. Once the deputy district attorney obtained a "no true bill," the district attorney accepted this result and, in the two years since then, has actively resisted any prosecution of the matter. Moreover, the deputy district attorney has, since the issuance by the district court of the challenged order, arguably adopted the position of the accused by repeatedly making statements to the media characterizing the suspects' statements to law enforcement officials as not being confessions or admissions. See, e.g., Judge Accuses DA of Withholding Evidence, Reno Gazette-Journal, February 13, 1988. It thus appears that the district attorney and his staff may have neither the desire nor the intention to see the case resubmitted to the grand jury or prosecuted by way of an information. See NRS 172.255(4) (permitting resubmission to the grand jury upon approval by the court). Since the record does not conclusively show, however, that the district attorney will not conscientiously perform his functions, we think the court, prior to taking further action, should accord the district attorney notice and an opportunity to be heard.
In Collier v. Legakes, 98 Nev. 307, 311, 646 P.2d 1219, 1221 (1982), the district court had disqualified the entire Clark County District Attorney's Office without *1259 first holding an evidentiary hearing or hearing argument from the district attorney. Because the court's ruling in that case was based solely on the appearance of impropriety, we concluded that the district judge had, in effect, failed to exercise his discretion. Consequently, we directed the district court to conduct a hearing to determine, after a consideration of all the relevant facts, whether the prosecutorial function could be carried out impartially by the district attorney's office. Similarly, in the present case, we conclude that a hearing is warranted to determine whether individual rather than vicarious disqualification may be appropriate under the circumstances of this case. See Collier v. Legakes, supra; Brinkman v. State, 95 Nev. 220, 592 P.2d 163 (1979).
Accordingly, we grant a writ of prohibition directing that the inquiry ordered below shall not proceed further until a hearing on notice to the district attorney has been conducted before the district court, affording the district attorney an opportunity to be heard. On remand, the court shall determine whether the district attorney was involved in or later ratified the deputy's derelictions, and whether the district attorney is able to go forward and is willing to resubmit the matter to the grand jury, should the court determine that resubmission is warranted. In order that the district attorney will be afforded a full and fair opportunity to respond thereto, the respondent judges shall place on record, for the consideration of the successor judge hereinafter designated, reports of any and all evidence which may tend to support their conclusions that there is a need for a special prosecutor herein. Because it appears that the respondent judges have already expressed factual determinations as to this ultimate issue, we hereby assign the Honorable David Zenoff, Senior Justice, to conduct the hearing on remand. Nev. Const. art. 6, § 19(1)(c).
YOUNG, J., concurs.
STEFFEN, Justice, with whom MOWBRAY, Justice, agrees, concurring:
The sole issue before this court is whether the district court exceeded its jurisdiction in divesting the district attorney of his prosecutorial prerogatives and appointing a special prosecutor to assume the functions of the district attorney in the criminal matter now before us. I concur only in that segment of the court's opinion that grants the writ of prohibition and conditionally concur on remanding the matter for hearing before a different district judge. The remainder of the majority opinion unnecessarily and, in my judgment, improperly, weighs and characterizes facts, addresses and purports to resolve unbriefed non-issues, and generally tends to cast a pall over future considerations by a successor judge. As a result, I have felt compelled to address the court's opinion.
Preliminarily, I think it necessary to correct the majority's attribution of endorsement by Chief Judge Robin Anne Wright of the "factual determinations" of the order issued by the Honorable Robert L. Schouweiler. Judge Wright, along with all seven of the other district court judges of the Second Judicial District, took unprecedented measures to fully separate themselves from the Schouweiler order of February 12, 1988 (the order at issue). In a written order filed on February 24, 1988 and entitled "Order Clarifying Import of Chief Judge's Signature," Chief Judge Wright and each of the other seven judges referred to the February 12, 1988 order as containing the opinion of Judge Robert Schouweiler. The eight-judge order then proceeded to declare that: "The judges of the other Departments in the Second Judicial District have had no involvement in the case to date and consequently have no desire or reason to express an opinion as to the form or the contents of that [the Schouweiler] order." Chief Judge Wright, beneath her signature, specified that she had signed the Schouweiler order "in her capacity as the Judge who presides over the grand jury." Obviously, the eight-judge "order" was tautological as everyone understands that the judge who was solely responsible for the order and its contents is the Honorable Robert L. Schouweiler. I therefore suggest that the majority has *1260 unfairly concluded that the Honorable Robin Anne Wright has "already expressed factual determinations as to this ultimate issue [the need for a special prosecutor]."

I. The Order

The order of February 12, 1988 (the order) was issued after certain ex parte contacts with Judge Schouweiler apparently convinced the judge that a grand jury's refusal to indict four UNR student-athletes for sexual assault resulted from a corrupt presentation or withholding of evidence by the district attorney's office. Unfortunately, the judge, rather than contacting the district attorney for an explanation or scheduling an informal hearing to fairly consider all aspects of the matter, issued the order charging the district attorney, Mills Lane, with personally handling the grand jury presentation together with a deputy, and with personally telling the investigating and knowledgeable sheriff's deputies that their testimony wouldn't be needed. Moreover, Judge Schouweiler's order described the issue as "whether the District Attorney, Mr. Lane, withheld from the Grand Jury evidence of confessions to, or admissions of, sexual assault by some of the suspects." Continuing, the order specified that "[t]he Court finds there is evidence to suggest that the District Attorney, Mr. Lane, may have concealed from the Grand Jury inculpatory evidence of a serious crime, sexual assault." The order proceeded to further malign Mr. Lane by strongly inferring that he had betrayed his public trust and concluding that it was "deeply disturbing to the Court that in this case Mr. Lane may have hidden evidence of possible guilt in connection with a most serious crime, violating his duty as a public prosecutor."
Thereafter, the order divested the district attorney of his prosecutorial prerogatives in the matter and appointed a special prosecutor to further evaluate the case for resubmission to the Washoe County Grand Jury and to determine whether to present evidence that a crime occurred.
Although Judge Schouweiler, in his answer to the petition, indicates that the district attorney manifested an "important misunderstanding" in accepting his appointment and designation of a "special prosecutor" at face value, and that the district attorney should have perceived that the order was only appointing a "special investigator," I suggest that the judge is wrong. Equally wrong, in my opinion, is the majority who has accepted Judge Schouweiler's belated explanation that the order appointed only an evaluator or investigator.
I have not the slightest doubt that Judge Schouweiler is aware of the difference between a special prosecutor and a special investigator. In appointing the former, the judge enjoined the district attorney from proceeding further in the case and then expressly appointed Paul D. Elcano, Jr., Esq. "to act as Special Prosecutor to perform the duties of District Attorney in this case." (Emphasis added.) Obviously, if the district judge merely wanted to launch a special investigation to ascertain whether wrongdoing existed in connection with the grand jury presentation, it would have been neither necessary nor judicially proper to enjoin the district attorney and appoint a "special prosecutor" to perform the duties of the district attorney. Moreover, the appointment was ostensibly made pursuant to NRS 252.100, the statute that deals with the appointment of a substitute for the district attorney when the district attorney "fails to attend any session of the district court, or for any reason is disqualified." Finally, the clear language of the order specifies that if the special prosecutor determines to present evidence to the grand jury, "he shall not proceed further without approval by the court." (Emphasis added.) Clearly, the order contemplated that the special prosecutor would handle the presentation before the grand jury if the judge agreed with his analysis and recommendation. In short, the order purported to relieve the district attorney from the performance of his duties, enjoined him from doing so, and thereafter specifically appointed Mr. Elcano as special prosecutor. The district attorney did not misunderstand *1261 the intended import and effect of the purported order.
The order, which was prepared and filed without notice or hearing and before Judge Schouweiler had even seen the transcript of the grand jury proceedings, was disseminated to the news media well in advance of the date when the district attorney received his formal copy. Moreover, the order cannot be viewed merely as a fugitive document purporting to substitute a special prosecutor for the district attorney. The order purports to reflect evidence in the possession of Judge Schouweiler indicating that Mr. Lane has committed a criminal offense. The judge, in a unilateral "finding," asserts that there is evidence to suggest that Mr. Lane may have concealed from the grand jury evidence of sexual assault. If, indeed, the judge has evidence proving that the district attorney "concealed" or "hid" evidence of the commission of a serious crime in order to preclude prosecution, action should be taken under NRS 252.190. If, on the other hand, the accusatory recitals of the order are without foundation, measures should be taken to prevent a reoccurrence of such a demeaning and destructive abuse of judicial power.
Although the district attorney has never had the opportunity to present his evidence before a tribunal authorized to weigh the facts, this court lends credence to the unilateral order by, inter alia, suggesting that it does not "inexorably follow that the district attorney himself, Mills Lane, was a blameworthy participant in the prosecutorial omissions." The clear implication of the majority's characterization is that Mr. Lane was most likely blameworthy, but the conclusion is not absolute. The majority then notes, quite unfairly and without justification, in my opinion, that the district attorney accepted the "no true bill" of the grand jury and, "in the two years since then, has actively resisted any prosecution of the matter." Again, the inference seems to be that a district attorney should personally seek to reclaim an indictment whenever a grand jury refuses to indict. More importantly, the majority and Judge Schouweiler incorrectly attribute to Mr. Lane an active resistance to prosecution when, in fact, the district attorney has done nothing other than resist an invalid order that sought to disqualify him without procedural due process. To my knowledge the district attorney has never indicated that he would not fully and fairly consider evidence tending to support an allegation that the matter was not effectively presented to the grand jury. It is clear that the order's assertion that "[t]he evidence indicates the case was handled by Mr. Mills Lane and Mr. John Aberasturi" is untrue according to the grand jury transcript. Unless Judge Schouweiler has evidence indicating that Mr. Lane was acting behind the scenes to instruct Mr. Aberasturi in his presentation, Mr. Lane has been falsely and unfairly accused of handling the case and no inference should be drawn that he would not be impartial or effective in reconsidering the matter.
Article 6, § 4 of the Nevada Constitution confers upon our court appellate jurisdiction on questions of law alone in all criminal cases originating in the district courts. This court said long ago that:
by a wise constitutional provision, the jurisdiction of this court, because of its situation, has been limited, in criminal cases, to questions of law alone. We can, as a question of law, decide whether or not there is any evidence in the record to support every fact that is necessary to constitute the crime of which the defendant has been convicted; but should we pass beyond that limit, we should assume the duties of the trial jury and court below, disregard a constitutional prohibition, and often fall into the error of giving weight and value to false testimony that has been properly considered and rejected by those who alone can judge of its character.
State v. Mills, 12 Nev. 403, 406 (1877).
The constitutional prohibition has special force in the instant proceeding where no properly constituted tribunal has "found" *1262 facts pertinent to the underlying grand jury presentation by the state. Judge Schouweiler had not seen the grand jury transcript before issuing his order, and in fact stated: "The issue presented is not in any way the possible guilt or innocence of those involved. The issue is whether the District Attorney, Mr. Lane, withheld from the Grand Jury evidence of confessions to, or admissions of, sexual assault by some of the suspects." Judge Schouweiler thereafter "found" that there is evidence of such concealment. Indeed, the judge ultimately shifted from a finding of evidence suggesting the concealment of evidence by Mr. Lane, to an unequivocal finding of such concealment when he declared that "[t]he trust of several groups of people is violated by this unconscionable withholding of evidence."
It is thus seen, as I observed previously, that Judge Schouweiler has issued an order implicating issues far more serious than the issue of the validity or impropriety of the order. The order purports to reflect evidence of the commission of a criminal suppression of evidence by Mr. Lane in order to frustrate prosecution of a series of felonies. Given the fact that the order was issued without notice or an opportunity to be heard, this court should exercise the greatest caution in characterizing the proceedings below. Although I will elucidate the point in greater detail hereafter, an example of my concern is illustrated by the majority's judgmental direction that "[o]n remand, the court shall determine whether the district attorney was involved in or later ratified the deputy's derelictions." (Emphasis supplied.)
Although the majority has said nothing about the validity of the order, it is clear that it is void. A writ of prohibition, appropriately issued by the majority in the instant case, will issue only where a tribunal has acted without or in excess of the jurisdiction of such tribunal. NRS 34.320; Goicoechea v. Fourth Judicial Dist. Court, 96 Nev. 287, 607 P.2d 1140 (1980); McComb v. Fourth Judicial Dist. Court, 36 Nev. 417, 136 P. 563 (1913). Here, Judge Schouweiler entered a criminal finding against the district attorney, disqualified him from proceeding with his rightful functions and appointed a special prosecutor to act in his stead without the due process requirements of notice and an opportunity to be heard. I therefore concur with the majority that prohibition must issue. Moreover, this court vacated the order of disqualification entered by the district court in Collier v. Legakes, 98 Nev. 307, 311, 646 P.2d 1219, 1221 (1982), where the district court judge failed to hold an evidentiary hearing and refused to hear argument by the district attorney. In Collier, there was at least a case and a motion before the court and the district attorney was given notice of the hearing. In the instant case, there was no case and no motion and no procedural rights were accorded the district attorney before entry of the order disqualifying him because of alleged findings of personal corruption. The entire matter was pre-judged by Judge Schouweiler based upon ex parte contacts and before he had even received a copy of the grand jury transcript.
In a remarkably similar case, State ex rel. Preissler v. Dostert, 163 W. Va. 719, 260 S.E.2d 279 (1979), an order entered by the general jurisdiction court (circuit court) without benefit of a motion and hearing was declared void and a petition for writ of prohibition granted. Although the office of prosecuting attorney in West Virginia is created by the state constitution, the holding in large measure is apposite to the instant case as there was no attempt to remove the prosecuting attorney from office  only to disqualify him pursuant to a West Virginia statute. Because of the obvious similarities, the following excerpts from Dostert have application here.
We note and are concerned that the record fails to show any institution or proceedings which would have invoked the jurisdiction of the circuit court to disqualify the elected prosecutor. We recognize that this issue is not raised by either party before us and ordinarily we would refuse to consider matters outside *1263 the pleadings. However, as this matter affects the jurisdiction or power of the lower court to act, this Court may properly raise the issue on its own motion and take notice of a lack of jurisdiction in the lower court.
* * * * * *
[I]n order for a court to obtain jurisdiction of a given case, proper procedures must be pursued. Proceedings in a court which has not acquired jurisdiction as provided and recognized by law are void and a nullity.
* * * * * *
We find nothing in the record to indicate that any recognized procedure was followed to invoke the jurisdiction of the circuit court to disqualify the prosecuting attorney.
The general rule is that in order for a court to obtain jurisdiction of a particular matter, there must be an appropriate application by a person invoking the judicial power of the court and that application must be in proper legal form. 20 Am.Jur.2d, Courts § 94; 21 C.J.S., Courts § 81. The proper form for application for an order recusing the prosecutor is by a motion, stating with particularity the grounds therefore [sic]. W. Va.R. Civ.P., Rule 7(b)(1). In this particular case, since there was no hearing or trial in progress before the circuit court, such a motion would have had to be in writing.
The record reveals no motion by either the petitioner or the State requesting the removal of the prosecutor from petitioner's case in magistrate court. The answer presents the sworn affidavit of petitioner's former counsel stating that counsel informally communicated to the respondent petitioner's demand that he either be allowed to have a hearing on the charges or that the charges be dismissed with prejudice. There is no evidence or allegation that a request was made at that time for recusal nor is there any record of a written motion to that effect. It is well-settled that a court of record speaks only through its record and anything not appearing on the record does not exist in law.
* * * * * *
With some exceptions, an attempt by a court to assume jurisdiction in a particular matter on its own motion is futile and proceedings had pursuant to such a motion are void. To permit a judge to invoke the jurisdiction of his court sua sponte would place him in a position of a complainant deciding the merits of his own complaint in violation of the ancient homily of the law that no man may be a judge in his own case.
Consequently, we hold that where, as here, there is no showing on the record that any party has properly instituted proceedings in a court of record, the court cannot exercise jurisdiction over the matter and any purported order or judgment entered is void and its enforcement may be restrained by prohibition.
* * * * * *
Finally, we note that the prosecuting attorney is elected by the people of the county to represent them in prosecutions against criminal offenders. Consequently, the public has a right to know why the attorney they have selected to represent them and whose salary they pay with their taxes, is unfit to prosecute a given case... . The court must provide every safeguard to insure the public that the business of the State is being properly conducted. A hearing on the record provides the public with an accurate record of the actions of their elected officials, upon which they may evaluate his performance.
We are of the opinion, therefore, that before a prosecuting attorney may be disqualified from acting in a particular case and relieved of the duties imposed upon him by the Constitution and by statute, the reasons for his disqualification must appear on the record, and where there is any factual question as to the propriety of the prosecutor acting in *1264 the matter, he must be afforded notice and an opportunity to be heard.
260 S.E.2d at 284-87.
This court was faced with the same type of misappropriated judicial power that existed in Dostert and the instant case in Cunningham v. Eighth Judicial Dist. Court, 102 Nev. 551, 729 P.2d 1328 (1986). In Cunningham we held:
More importantly, it is apparent that Judge Goldman acted in excess of his jurisdiction not only when he "ordered" Commander Cunningham to appear in his chamber within ten minutes, but later when he issued the show cause order, and when he held Commander Cunningham in contempt of court. No civil or criminal action was pending before Judge Goldman during this time upon which such orders might lawfully issue. A district judge has no authority, inherent or otherwise, to issue an order to anyone to appear before him except as expressly provided by law. Because no criminal or civil action involving the right to possess the video tapes was pending before Judge Goldman, he lacked subject matter jurisdiction over the underlying dispute. Furthermore, because nothing remotely resembling a proper order had been issued and served upon Cunningham, in regard to any proper proceeding, Judge Goldman had no personal jurisdiction whatever over Cunningham. Even if the necessary action had been properly before Judge Goldman, a district judge lacks jurisdiction to order anyone to appear without cause and without reasonable notice, or outside the ordinary process of the court. Such orders, entered without jurisdiction, constitute an abuse of judicial power.
102 Nev. at 560, 729 P.2d at 1334 (emphasis added).
Similarly, Judge Schouweiler, with no criminal or civil proceeding before him, proceeded to issue an order purporting to (1) contain findings of corruption against the district attorney, Mills Lane; (2) based upon such unilateral findings, disqualify and enjoin the district attorney from acting; and (3) appoint a special prosecutor to act in the place of the district attorney. As we held in Cunningham, "because nothing remotely resembling a proper order had been issued and served upon [Mr. Lane], in regard to any proper proceeding, Judge [Schouweiler] had no personal jurisdiction whatever over [Lane]."
By statute in Nevada, NRS 252.080, the district attorney is the public prosecutor within the county of his or her election. Although a district judge empanels a grand jury and has supervisory powers in connection therewith, the judge is not authorized to assume or usurp the functions of the elected public prosecutor. In Nevada, "the matter of the prosecution of any criminal case is within the entire control of the district attorney." Cairns v. Sheriff, 89 Nev. 113, 115, 508 P.2d 1015, 1017 (1973). It is also clear that the district court does not have supervisory powers over the district attorney, and cannot dictate to the district attorney how he is to exercise his discretion or perform his functions. Under Nevada law, NRS 228.120(2), the attorney general has supervisory powers over the district attorneys.
Procedurally, if Judge Schouweiler received evidence indicating the district attorney had concealed evidence of serious crime in order to frustrate prosecution, the judge should have presented such evidence to the attorney general. The attorney general, under his supervisory powers, could have investigated the matter and, if convinced of wrongdoing, taken it to a grand jury under NRS 228.120(1). As it is, the judge invoked his own jurisdiction, listened to himself as complainant and then adjudicated the matter as judge in issuing the order. This type of procedure must, in my opinion, be soundly condemned as an intolerable abuse of judicial power. If judges, without a case or proceeding before them that properly invokes the court's jurisdiction, can simply issue orders upon ex parte reports that affect lives as seriously as the order at issue, then our judicial system has *1265 lost all contact with concepts of procedural due process cherished so long in this state and nation.
As observed by the Dostert court, if the elected public prosecutor is unfit to prosecute a case, the public has a right to know why. And that question cannot be answered by a district court judge who invokes his own jurisdiction sua sponte in order to judge the merits of a cause in which the judge is also the complainant.[1]
Finally, I shall not unnecessarily prolong this concurrence by analyzing the due process violation resulting from the Schouweiler order. Suffice it to say that the complex of factors involving defamation of character, denial of statutory rights and privileges of office, and the appointment of another to act in his stead, all without notice or an opportunity to be heard, constitutes a denial of procedural due process which also renders the order void.

II. The Facts

As I have stated previously, I do not consider it either appropriate or within the constitutionally authorized powers of this court to weigh, characterize and draw inferences from the "facts" reflected by the grand jury transcript, newspaper stories and the invalid order issued by Judge Schouweiler. Simply stated, there have been no relevant findings of facts by a duly authorized tribunal or fact-finder in this matter. The "findings" of the order would not even pass muster in an inquisitional system, let alone the adversarial system of this state and nation. The order itself emphasizes that the guilt or innocence of the grand jury targets is not an issue. Nevertheless, the majority has drawn factual inferences from the grand jury proceedings that tend to supply credence to the void order. For example, the majority contends that the "respondent judges' [I have already noted the error in attempting to credit Chief Judge Robin Wright with endorsing or participating in the contents of the order] determination is well founded that complaints tendered to the district court by victims of alleged sexual assaults, and by two investigating officers of the Washoe County Sheriff's Department, warrant judicial inquiry." In support of such a characterization and conclusion, the majority proceeds as follows:
"(a) The record reflects without contradiction that the district attorney's deputy who presented the case to the grand jury did so in a manner that, as a natural consequence, precluded the grand jury from knowing about or considering the testimony of the investigating officers;"
My response: This finding of fact and conclusion represents, in my view, a one-sided perspective of the evidence. The affidavit of Chief Deputy District Attorney John Aberasturi who, in contrast to a finding by Judge Schouweiler that the "evidence indicates the case was handled by Mr. Mills Lane and Mr. John Aberasturi," was the only representative of the district attorney handling the case, avers that he informed grand jurors of the nature of the potential testimony of the investigating officers. Although Aberasturi avers that this information was given to the grand jurors informally and after they had returned a finding of no true bill, he also stated that the grand jurors indicated the testimony would have made no difference. If Aberasturi is truthful in his averment, there was no attempt to conceal this information from grand jurors who, presumedly, upon hearing *1266 what the officers would say, could have recalled their finding and proceeded with the hearing, at least upon petition to the court. In any event, this is a factual dispute that can be properly resolved only upon evidence presented in a district court proceeding where all parties may be heard. Until such time as a proper evidentiary hearing occurs, I suggest that this court has no proper role in wrestling with alleged facts and drawing inferences therefrom.
"(b) In presenting the case to the grand jury, the district attorney's deputy also depreciated the prosecution's case by multiple violations before the grand jury of Nevada's `rape shield law,' NRS 50.090 and 48.069;"
My response: I shall address this non-briefed, non-issue in detail later. I note at this juncture, however, that it first formally surfaced in Judge Schouweiler's Answer to the district attorney's Petition For Reconsideration Or For Rehearing filed on March 7, 1988. The respondent judge cited only the Nevada statute, NRS 50.090, as authority for his assertion that the district attorney violated Nevada's rape shield law. Even if it could be accepted, for purposes of argument, that the rape shield law was somehow violated, I am at a loss to understand the relevance of such an assertion both as to the Schouweiler order that describes the only issue as being whether Lane withheld evidence of sexual assault, and the single issue before this court, i.e., whether Judge Schouweiler's order is valid or effective for any purpose. Suffice it to say here that I strongly disagree with the majority's finding of "multiple violations" of Nevada's rape shield law.
"(c) The district attorney's deputy depreciated and prejudiced the prosecution's case by the introduction of hearsay testimony which, as a natural and apparently intended consequence, diminished the credibility of the complaining witnesses."
My response: Again, my brethren in the majority have parsed the grand jury transcript and reached a factual determination that the deputy district attorney apparently intended to diminish the credibility of the complaining witnesses. I have read the entire record and certainly did not find a sufficient and reliable evidentiary basis for joining in such a determination. Nor is it my function or theirs to make such a determination in the matter before us. If this court were to begin with the premise that the deputy district attorney was presumedly performing his duties in good faith absent clear evidence to the contrary, the record before us would simply not justify the majority's attribution of corruption in his presentation to the grand jury. I will illustrate this point further as I address the majority's recital of facts and its apparent belief concerning the inadmissibility of hearsay testimony.
As previously observed, I do not consider it proper or relevant for this court to selectively recite facts, draw inferences or reach conclusions from the transcript of the grand jury proceedings. Because the majority has done so, I shall also recite from the record, using the pseudonyms adopted by my brethren.
On February 22, 1986, at approximately 2:00 a.m., Jane and Mary entered Nye Hall, a coeducational dorm at UNR. Both had been drinking, but Mary, by her own admission, was intoxicated at a level of "eight" on a scale of one to ten. The young women entered Nye Hall and went directly to the men's side of the dorm on the second floor. After entering one of the men's rooms and visiting for a time, the two went down the hall to another room, where the door was closed and the lights were out. The young women admitted themselves, awakened the two young men in the room, and visited for a time with them. Thereafter, Jane and Mary returned to the first room where the alleged sexual assaults occurred. Jane, who was wearing only a bra beneath her dress, engaged in sexual intercourse with one of the targets with whom she had enjoyed a previous romantic relationship. Jane protested, however, when her partner eventually suggested that they switch to Mary and another *1267 young man who had completed intercourse with Mary. The switch was nevertheless accomplished and Jane described the second act of intercourse as something she didn't want from a young man who was a friend, but not a romantic friend. Jane also characterized the friend's behavior during and after the episode by saying "he wasn't a gentleman at all." After leaving Nye, Jane testified that she went straight to her apartment, "got into bed and went to sleep." Jane also testified that she didn't call the police until five days later, when another football player (Roe) called her and said "I heard you guys were porn queens a couple days ago." After the call, Jane and Mary went back to Nye Hall where they eventually encountered one of the targets. Jane testified as follows concerning that encounter:
Q. What did you say to him?
A. I made some threats to him.
Q. Like what?
A. Like he better get a lawyer.
Q. Did you tell him that?
A. Because what was running through my mind was I couldn't believe what he did to me, and I couldn't believe what happened that night. And I didn't really know how to deal with it. And I wasn't looking at it  I wasn't  when I first looked at the situation, I was thinking "Okay, these are friends who are, you know, they are"  how do you explain? I wasn't intending to make an issue out of it until I talked to my mother and told my mother what happened.
Q. When did you tell your mother?
A. Right after I left Nye Hall.
Q. Now you said  when you said to [target] "You better get a lawyer," what did you mean? Were you saying that because you were mad at him, just as a threat?
A. I wanted him mostly to keep his mouth shut. It was really hard for me to believe that he would walk around telling people what he did. Because what he did was not right to me. And I had a hard time believing.
Mary, who was allegedly victimized by more of the targets than Jane, also testified in part as follows:
Q. Now you reported this to the police late Wednesday night [the alleged sexual assaults occurred the previous Saturday] right?
A. Yes.
Q. What brought you to call the police that night?
A. I didn't want to call the police. I just wanted to go to the doctor, make sure I wasn't pregnant.
Q. Did you go to the doctor's?
A. Yes.
Q. Did you tell the doctor what happened?
A. [Jane's] dad did.
Mary also testified concerning the call from Roe that had prompted Jane to go to the police. Mary, who said that she had a romantic relationship with Roe, indicated that Roe was upset with her.
Roe also testified before the grand jury in part, as follows:
Q. Do you know [Mary]?
A. Yes, I do.
Q. Have you had a romantic relationship with [Mary]?
A. I wouldn't call it romantic. Maybe sexual.
* * * * * *
Q. Did you at some time hear about the happenings of that Saturday morning?
A. Yes.
Q. How did you hear about it?
A. I heard through a couple other guys on the floor....
Q. Was it kind of the hot news on the floor?
A. People were talking about it, yes.
* * * * * *
Q. After the police talked to you, [Mary] called you?

*1268 A... . She [Mary] said she felt she owed me an explanation of what had happened. I told her she didn't owe me anything. And I did inquire about it, asked her "Why are you guys lying about this and trying to get [target] and [target] and all them in trouble?"
Q. What did she say?
A. She said it  I said "Why are you lying about and saying they raped you?" Was my direct statement. She said "They did not rape us. I feel they took advantage of us."
Q. "They took advantage of us?"
A. That is what she said.
Another witness who was present for a time with several other young men and Jane and Mary, testified as to some sexually provocative statements Mary made to him prior to his leaving the room. I am not moved to extend my efforts further concerning factual assertions contained in the record but which continue to have no relevance in this original writ proceeding. Suffice it to say that the record presently before this court reflects a telling basis for the grand jury's refusal to issue a true bill. I therefore consider it inappropriate for this court to characterize the performance of the deputy district attorney in any pejorative light. I accordingly disapprove of such conclusory characterizations by the majority as "prosecutorial omissions," "prior failures of the prosecution," "whether the district attorney's office will proceed properly with the case in the future," and "deputy's derelictions." Such aspersions have no bearing on the issue before us and can serve only to create predilections on the part of a successor judge who is charged with the obligation of judging the matter impartially.

III. Nevada's Rape Shield Law

I respectfully suggest that this is another example of gratis dictum included in the majority opinion. The "issue" has no relevance to the issuance of prohibition by this court, was never briefed, and has no relationship to the issue of prosecutorial corruption raised in the Schouweiler order. Moreover, the majority has shepherded the "issue" to the point of ostensibly settling the law as to the applicability of Nevada's rape shield statute to the state and a grand jury proceeding. I respectfully suggest that my brethren have created or yielded to a red herring, have incorrectly interpreted the statute and have, in any event, produced dicta that is non-binding as to this case or any other future case.
As noted, because the rape shield law is not an issue in this proceeding for an original writ, the parties have not briefed the matter or presented authorities to this court upon which an enlightened determination could be made. Nevertheless, the majority has elected to address the rape shield "issue" as if it were a relevant aspect of the prosecutor's presentation to the grand jury. Although my thoughts on the "issue" will have no more legal weight or effect than those of the majority, I feel compelled to counterbalance what I consider to be a unilateral view of the subject.
The purpose of the grand jury has been described as follows: "to investigate possible offenses and to act as an independent barrier which protects the innocent from oppressive prosecution." Losavio v. Kikel, 187 Colo. 148, 529 P.2d 306, 310 (1974). It is also said that the grand jury proceeding "is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." State v. Bell, 60 Haw. 241, 589 P.2d 517, 519 (1979). Historically, the grand jury has also been viewed as a safeguard in protecting citizens against unfounded criminal prosecutions. State v. O'Daniel, 62 Haw. 518, 616 P.2d 1383, 1386 (1980). Grand jury proceedings are secret (NRS 172.245) except under limited exceptions. Reasons for secrecy have been iterated by this court as:
(1) To prevent the escape of those whose indictment may be contemplated. (2) To insure the utmost freedom to the grand jury in its deliberations and to prevent persons subject to indictment, or their *1269 friends, from importuning the grand jurors. (3) To prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it. (4) To encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes. (5) To protect an innocent accused, who is exonerated, from disclosure of the fact that he has been under investigation.
Shelby v. Sixth Judicial Dist. Court, 82 Nev. 204, 210, 414 P.2d 942, 945 (1966).
It is thus seen that the grand jury functions in secrecy for the purpose of determining whether a crime has been committed and whether the target should be charged. Additionally, the grand jury is to secure the innocent from oppressive prosecution. In connection with the latter concern, Nevada statutory law, NRS 172.145(2), and this court have mandated the district attorney to disclose exculpatory evidence to a grand jury. Sheriff, Clark County v. Frank, 103 Nev. 160, 734 P.2d 1241 (1987). And in Frank, we implicitly determined that exculpatory evidence is that which has a tendency to explain away the charge against the target of the grand jury's investigation. Id. at 164, 734 P.2d at 1244. Moreover, we also noted that the mission of the grand jury is "to clear the innocent, no less than to bring to trial those who may be guilty." Id.
I reiterate that I have approached the facts with reluctance for I certainly have no interest in preventing prosecution or further investigation if either are warranted. In reading and re-reading the transcript, I have substantial difficulty reading allegations of sexual assault and kidnapping into the statements of the young women. It reads more like the statements of two young women who were inviting sexual activity, but perhaps with less enthusiasm from one young man than with another. The one "victim" testified that she mostly wanted one of the targets "to keep his mouth shut." The other, who admitted she did not want to call the police, also said, according to the testimony of Roe, that the targets "did not rape us." Given the equivocal testimony of the complaining witnesses, it was entirely appropriate that the grand jury hear the evidence bearing on the prior sexual activities of the young women in the UNR setting.
Nevada's rape shield statute, NRS 50.090, by its terms has no application to the prosecutor and therefore has no bearing on this matter even if it were an issue in this original writ proceeding. The statute reads as follows:
In any prosecution for sexual assault or statutory sexual seduction or for assault with intent to commit, attempt to commit or conspiracy to commit either crime, the accused may not present evidence of any previous sexual conduct of the victim of the crime to challenge the victim's credibility as a witness unless the prosecutor has presented evidence or the victim has testified concerning such conduct, or the absence of such conduct, in which case the scope of the accused's cross-examination of the victim or rebuttal shall be limited to the evidence presented by the prosecutor or victim.
(Emphasis added.)
The language of the statute unambiguously prohibits presentation of evidence of a victim's previous sexual conduct only by the accused. Moreover, the statute by clear implication acknowledges that the prosecutor may present such evidence. Similarly, NRS 48.069, cited by the majority, applies only to the accused and has no constraints whatsoever on the prosecutor. Nor does the majority's attempt to exclude rape shield evidence on grounds that a grand jury proceeding is not a prosecution make any sense. The rape shield law simply does not apply to the prosecutor in trial or during any other proceeding. The majority's view that because a grand jury proceeding is not a prosecution, the exceptional evidence under NRS 50.090 and 48.069 could not become legal evidence within the meaning of NRS 172.135(2) is also *1270 flawed. Again, such exceptional evidence applies only to evidence sought to be introduced by an accused. It has no bearing on the right of a prosecutor to introduce evidence of a victim's prior sexual history. Moreover, none of the cases or the law review article cited by the majority supports its position. In each of the cases, People v. McKenna, 196 Colo. 367, 585 P.2d 275 (1978), Summitt v. State, 101 Nev. 159, 697 P.2d 1374 (1985), State v. Hudlow, 99 Wash.2d 1, 659 P.2d 514 (1983), the issue concerned only the right of a defendant to present evidence of a victim's prior sexual history. In Hudlow, the prosecution actually elicited some evidence of a victim's knowledge of sexual terms and the court never questioned the prosecutor's right to do so. The only issue on the point was the extent to which the prosecutor had opened the door to further inquiry on cross-examination by the defendant. Similarly, in McKenna there was no indication that the prosecution was limited by Colorado's rape shield statute even though the Colorado statute is not at all similar to Nevada's statute. Thus, the court observed that "rather than completely denying the defendant's rights in order to protect the victim's privacy interest, the statute strikes a balance by conditioning admission of evidence of the victim's sexual history on the defendant's preliminary showing that it is relevant." 585 P.2d at 279 (emphasis added).
The majority's reference to Summitt is even more puzzling. I dissented in Summitt because I was convinced that the Summitt majority had unnecessarily attenuated Nevada's rape shield statute in favor of an accused's right to confront a complaining witness in order to show bias. In dissent, I stated as follows:
Another consequence of the majority ruling is that it actually violates the spirit of the rape shield law by accommodating a general attack on the credibility of the child-victim. In effect, the majority holds that the child's prior experience as a four-year-old victim of sexual assault in the form of fellatio may be admitted as a basis for inferring that she contrived a charge of cunnilingus against Summitt. We are thus propelled into the concept that sexual history in general, as opposed to specific instances of sexual experience in particular, may be introduced to attack the credibility of a prosecutrix. It is clear that such a proposition substantially expands both the holding and the ratio decidendi of State v. Howard, supra. It also appears, given the tender age of the prosecutrix in the instant case, that the proposition created by this decision would apply in virtually all instances involving a child-victim whose sexual "history" is limited to an experience of sexual assault occurring at age four or above. I am simply unable to reconcile the majority ruling "with the necessity of accommodating the competing interests of complaining witnesses and defendants" by construing and applying the rape shield law "so as to uphold the constitutional rights of defendants, while creating the least possible interference with the legislative purpose reflected in the statutes." I therefore conclude that the majority position is in conflict with the basic purpose and spirit of Nevada's rape shield statute.
101 Nev. at 165-66, 697 P.2d 1278-79. In short, Summitt concerned itself with an expansive right of a defendant to circumvent Nevada's rape shield statute and had nothing whatsoever to do with the right of a prosecutor to present evidence of a victim's prior sexual history. The point is illustrated by referring to the majority's rationale for reversing the conviction in Summitt:
In the instant case the defendant does not seek to impeach the credibility of the complaining witness by a general allegation of unchastity. Rather, the specific evidence was offered to show knowledge of such acts rather than lack of chastity. We agree with the ruling of the Supreme Court of New Hampshire in State v. Howard, supra [121 N.H. 53] 426 A.2d [457] at 462 [(1981)]:
We believe that the average juror would perceive the average twelve-year-old *1271 girl as a sexual innocent. Therefore, it is probable that jurors would believe that the sexual experience she describes must have occurred in connection with the incident being prosecuted; otherwise, she could not have described it. However, if statutory rape victims have had other sexual experiences, it would be possible for them to provide detailed, realistic testimony concerning an incident that may never have happened. To preclude a defendant from presenting such evidence to the jury, if it is otherwise admissible, would be obvious error. Accordingly, a defendant must be afforded the opportunity to show, by specific incidents of sexual conduct, that the prosecutrix has the experience and ability to contrive a statutory rape charge against him.
Id. at 163-64, 697 P.2d at 1377 (footnote omitted).
The law review comment cited by the majority, Comment, Evidence  Admissibility of the Victim's Past Sexual Behavior Under Washington's Rape Evidence Law  Wash. Rev. Code § 9.79.150 (1976), 52 Wash.L.Rev. 1011, 1033 (1977), also has no bearing on the "non-issue" before us. It neither states nor suggests that the dissimilar Washington statute operates as any form of constraint on the prosecution.
There is good reason why the majority has produced no law or precedent supporting their novel proposition. A prosecutor's function is to achieve justice, not secure a prosecution or conviction. If justice demands a prosecution or conviction then the prosecutor must be diligent in seeking such a result. But in doing so, a prosecutor is not privileged to pre-judge guilt or innocence and manipulate or conceal evidence to achieve victory according to his or her predilection. On the other hand, under our adversary system, defense counsel is expected to assert every lawful and ethical effort to make certain that prosecutions or convictions occur lawfully and in accordance with the prosecution's heavy burden of proof. Thus, under statutory law and the precedents of our court, a prosecutor is obligated to present exculpatory evidence to a defendant for his or her use at trial, and to the grand jury for the consideration of grand jurors in their determination of whether to indict. Nevertheless, the majority concludes that if a prosecutor is permitted to present sexual history evidence of an alleged victim before grand juries "while as here the complaining witnesses are afforded no chance to explain or deny, it is likely few, if any, indictments would be returned." I disagree with the conclusion for several reasons. First, in the instant case, the grand jury was perfectly free to recall Jane and Mary to explain or deny what other witnesses had said concerning them. There is not the slightest evidence that the deputy district attorney would have attempted to thwart such a request. Secondly, it would be rare, indeed, when a prosecutor felt ethically compelled to present or permit the presentation of such evidence. In the instant case, we are not called upon to determine whether the deputy district attorney exhibited the highest level of competence in moving the grand jury toward an indictment. Rather, we are called upon to determine whether a district court judge has jurisdiction to issue an order finding that a district attorney has manipulated the grand jury into a failure to indict by purposely and criminally concealing evidence, and thereafter disqualifying the district attorney and appointing a special prosecutor to act in his stead  all without notice and an opportunity to be heard. Finally, this court has no formal appellate concern over prosecutorial incompetence in failing to convince a grand jury to indict; it does, however, have legitimate appellate concern over the subject matter of the nature set forth in the Schouweiler order when such orders have issued by a court having jurisdiction and in accordance with the demands of fundamental due process. It is therefore unrealistic to conclude that "few, if any, indictments, [will] be returned," because the situation of indictment frustration resulting from a *1272 prosecutor's corruption will be rare, and when discovered, will be effectively dealt with by the executive and judicial branches of government. I am unwilling to assume that Mr. Lane or any of our other district attorneys will tolerate incompetence among their deputies and that failure to present cases effectively before grand juries, magistrates or in trial will be condoned or disregarded.
Finally, I find difficulty relating to the majority's treatment of the prosecutor's obligation to present exculpatory evidence. Roe's testimony indicating that Mary told him that the targets "did not rape us" is clearly exculpatory and the prosecutor's failure to present it here would have been far more egregious than the prosecutorial omission in the Frank case. The majority has not specifically identified the foregoing testimony as part of the general hearsay complaint contained in their opinion but have impliedly impugned its propriety. I therefore suggest that the hearsay statement attributed by Roe to Mary is in any event admissible as an inconsistent statement. Although it is difficult to emphatically characterize Mary's grand jury testimony as inculpatory, she was an alleged victim of sexual assault and was testifying in the supportive role of complaining witness. A number of courts have agreed that: "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement." People v. Green, 3 Cal.3d 981, 92 Cal. Rptr. 494, 498, 479 P.2d 998, 1002, cert. dismissed, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1971). See also U.S. v. Barrett, 539 F.2d 244 (1st Cir.1976); State v. Whelan, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986). There are other bases for admitting the testimony that needn't be discussed further at this point. Suffice it to say that none of the prosecutor's supposed derelictions or omissions can be faulted as violations of Nevada's rape shield statute. If the majority desires to impose constraints on prosecutors as the rape shield statute does on those accused of committing crimes, then resort to the legislature would be appropriate. In the meantime, there are few reasons to be concerned about the rare circumstance when a prosecutor would feel compelled to provide rape shield type information to grand juries; and when and if the occasion arises, the secret nature of the proceeding would provide a major safeguard to a victim's reputation.

IV. Hearsay Diminishing Victims' Credibility

The majority criticizes the prosecutor for permitting the hearsay testimony of two persons, Doe and Roe, who were not present at the time of the alleged assaults. I have previously covered part of Roe's testimony concerning his telephone conversation with Mary. Because the prosecutor is not constrained by the rape shield law, Mr. Aberasturi committed no violation of law in asking Roe about the nature of his relationship with Mary. Roe's testimony concerning his sexual relationship with Mary explains why she called him and indicated she owed him an explanation. The testimony thus provided context and reason to the conversation as opposed to an attempt to besmirch Mary's character or credibility.
Doe was present in the room with several other young men and Jane and Mary before the alleged assaults occurred. He did not know either of the complaining witnesses personally, and left the building prior to the time of the alleged incidents. He testified, however, that as he walked into the room, Mary, who was "real intoxicated," said "You know, you got a nice ass." Doe said he was "just messing around with her because she was real drunk, just tapping her." Doe testified that Mary then said to him, "You don't want to mess with anybody that gives the best h____ in Reno." Unquestionably, the testimony was demeaning to Mary, but it did reveal a mind state that tended to explain why the young women were present in the men's side of Nye Hall at such an early hour. NRS 51.105 excepts *1273 from the hearsay rule statements of a declarant's then existing state of mind or emotion such as intent, plan, design, motive or mental feeling.
In any event, I reemphasize my frustration over the majority's demeaning criticism of the deputy district attorney's presentation to the grand jury. As this court has previously held: "It is not the province of the court to sit in review of the investigations of a grand jury as upon the review of a trial when error is alleged... ." Ex parte Stearns, 68 Nev. 155, 159, 227 P.2d 971, 973 (1951). We have also held that even though "inadmissible hearsay testimony may have been adduced before the grand jury contrary to NRS 172.260(2), still if there is the slightest sufficient legal evidence and best in degree appearing in the record the indictment will be sustained." Robertson v. State, 84 Nev. 559, 561-62, 445 P.2d 352, 353 (1968), reaffirmed and cited in Frank, 103 Nev. at 165, 734 P.2d at 1245.
To my knowledge, this court has never involved itself in considering the competence of a prosecutor in failing to secure an indictment. I know of no basis for so doing in the instant case. Whether Mr. Aberasturi erroneously permitted hearsay expressions elicited by grand jurors or from his own methodology in questioning witnesses is simply not an issue before this court.

V. Notice And Opportunity To Be Heard

The district attorney, in his original Petition For Writ Of Prohibition and his affidavit filed in support thereof, advised this court that the Schouweiler order had been issued and filed without notice and an opportunity to be heard. Indeed, Mr. Lane's affidavit details at length how the first time he heard of the order and obtained a copy thereof was from the news media. The order, which was filed at 4:55 p.m. on February 12, 1988, had somehow been immediately distributed to the news media but had not been delivered to the district attorney.
My brethren in the majority deprecate the district attorney for not having provided "legal authority demonstrating that a district attorney is entitled to notice and an opportunity to be heard prior to being enjoined from investigating a particular case." With profound respect for my colleagues, I suggest that this court has, on numerous occasions, granted relief on the basis of far less information and issues far less compelling. Indeed, Judge Schouweiler's belated reference to Nevada's rape shield law was "supported" only by reference to the statute itself which, as I have heretofore demonstrated, utterly fails to sustain his position on the point. And yet the majority researched and produced non-supportive case authorities attempting to justify the honorable judge's gratuity without a whisper about the judge's complete lack of authorities on the point. Surely this court could have cheerfully accorded the same respect to the district attorney on so clear a point as a due process failure to provide notice and an opportunity to be heard. Moreover, this court was surely familiar with its own recent decisions involving far less egregious circumstances in the Collier and Cunningham cases discussed above.
For the reasons hereinbefore discussed in part, I unreservedly concur with the result reached by the majority in granting prohibition and conditionally concur in remanding the matter for a hearing before another judge. Prohibition is appropriate to recognize and deal with the void order and Judge Schouweiler's ongoing activities with the illegitimate special prosecutor. It seems clear, however, that because Judge Schouweiler was without jurisdiction in the premises, a judge hearing the matter on remand would be equally without jurisdiction. And yet, to merely issue prohibition and declare the order void would be unfair to the district attorney who stands publicly accused and essentially "found guilty" of criminal misconduct. A healthy judicial conscience could not, in my judgment, countenance leaving the district attorney in such a state of limbo. Moreover, if indeed *1274 a rightful criminal prosecution has been thwarted, the demands of justice should be forthrightly secured.
Inasmuch as Judge Schouweiler has issued both accusations and findings concerning the district attorney, upon remand I would treat Judge Schouweiler as the complainant and use his void order as a complaint for the purpose of providing a case upon which jurisdiction could attach in the determination of the district attorney's status by a different judge. Otherwise, I have grave difficulty with the jurisdictional basis for a hearing on remand, and can concur only in the issuance of prohibition.
MOWBRAY, J., concurs.
GUNDERSON, Chief Justice, concurring and dissenting:
I would deny the petition for rehearing, in toto, for at least two reasons:
First, as my brothers Springer and Young have noted, the District Attorney originally based his petition for a writ of prohibition, which we summarily denied, on the insupportable legal premise that he is vested with sole control over the Grand Jury  to the exclusion of any District Court judge  and may, therefore, abuse the Grand Jury processes just however he may deem fit.
Only in the District Attorney's petition for rehearing did he begin to retreat from this untenable position, and begin to tender seriously the claim that the District Court should have allowed him notice and an opportunity to be heard before invoking its supervisory powers. Therefore, I suggest it would be appropriate to deny his petition for rehearing on the well established basis that the petition does not, as it should, direct attention to matters of fact or law earlier relied upon but overlooked by this Court. Stanfill v. State, 99 Nev. 499, 501, 665 P.2d 1146, 1147 (1983). To the contrary, the petition for rehearing improperly seeks to argue points heretofore not properly presented and supported, and also inappropriately seeks to reargue points already heard and decided. Id; NRAP 40(c)(1). See also In re Herrmann, 100 Nev. 149, 151, 679 P.2d 246, 247 (1984).
In my opinion, this Court should hold the District Attorney's office to the same standard of competence which would be imposed upon private attorneys. And, from my experience, I am persuaded this Court would not ordinarily recognize a petition for rehearing that so inadequately, and belatedly, raised issues different from, and at odds with, the theory originally tendered.
Second, assuming we should consider the issue of notice which the District Attorney now so belatedly seeks to raise, I do not think the District Judge needed to notify the District Attorney before initiating an inquiry into the complaints of the police officers and apparent victims, who evidently invoked his assistance in frustration and outrage. I believe the District Judge, acting in his supervisory capacity over the Grand Jury, correctly acted without notice by launching an investigation into the complaints of the police officers that the prosecution had inappropriately manipulated the Grand Jury. The police and the alleged victims have directed attention to ample evidence supporting their concerns, and warranting further inquiry.
The suggestion has been tendered that the District Judge somehow acted unfairly because, before the District Attorney received his copy of the order in the mail, the judge allowed the press access to his order appointing an investigator. I see nothing in this conduct to establish that the District Attorney has been the subject of any unfair imposition. Indeed, in this Court, we follow exactly the same practice as did the District Judge. Upon the filing of a decision, this Court immediately supplies copies to all members of the local capitol press corps; the attorneys commonly receive their copies later, by mail. Of course, an attorney is not prejudiced by this practice because, so long as a matter is pending  as it is, until all avenues of review are ended  he or she has no right to comment publicly in any way which may prejudice *1275 the administration of justice. SCR 177; Williams v. State, 103 Nev. 106, 734 P.2d 700 (1987).
It is only because the particular District Attorney involved in this case has so often previously been allowed to ignore the rules of professional conduct  by repeatedly calling illicit press conferences, and repeatedly commenting on pending litigation  that anyone can imagine he was victimized because the press received copies of the order before he did. Apparently, some notion exists that the District Attorney has a prescriptive right to disregard the rules of professional conduct, and that, if he had received a copy of the District Judge's decision before members of the press did, he could have prepared better for his improper commentaries to media representatives.
In any case, the cavil is beside the point. I believe that the irregularities identified by the police and the alleged victims fully warrant the inquiry ordered by the District Judge. For me, it is hard to believe that the District Attorney has not heretofore known of, and approved, the conduct of his deputy. If he did not know previously, the District Attorney certainly learned of his deputy's actions during the course of these proceedings; however, attempts to defeat the concerns of the police have continued. Never has the District Attorney offered to go back and properly present to the Grand Jury the evidence assembled by the police, which was withheld from the Grand Jury, while, at the same time, other evidence of an inappropriate character was presented to defeat their case. I cannot imagine what excuse can be tendered to any substitute judge that would inspire belief in the District Attorney's current readiness to prosecute the case properly, after all that has heretofore been done to undercut a correct prosecution.
Nonetheless, since I feel inquiry into the complaints tendered by the police must now move forward, I cast my vote in support of the action designated by Justices Springer and Young, thereby allowing the District Attorney an opportunity to vindicate the unusual prosecutorial techniques of his office, if he can.
In conclusion, I note it is no longer acceptable to ignore the complaints of women concerning sexual attacks, by the comfortable intonation of the notion that, by their prior sexual conduct, they have "asked for it," and have rendered themselves outlaws, beyond the protections of judicial process.[1] The flow of history and precedent supports the Reno law enforcement officers' perspective of this matter. The difference between the views of the police, and the views of those who have guided the "prosecution," appear to me to lie at the heart of the current dispute.
NOTES
[1] These are fictitious names assigned to them for purposes of this opinion.
[2] Although the district attorney represents that this data did not constitute admissions or confessions, he has not tendered to this court for evaluation any of the data compiled by the officers.
[3] Specifically, the deputy district attorney avers:

The Grand Jury issued invitations to all four targets to appear and to testify in this proceeding. All four targets were available at the March 26 hearing and had indicated through their respective counsel that each would testify at either the March 26 hearing or the April 10 hearing and that their testimony would be consistent with statements given to law enforcement officers.
See paragraph 7, affidavit in support of petition for reconsideration or for rehearing.
[4] The deputy district attorney has represented to this court that "[t]hese witnesses were available for the Grand Jury on March 26 and would have been made available to the Grand Jury on April 10." See paragraph 15, affidavit in support of petition for reconsideration or for rehearing.
[5] In paragraph 15 of his affidavit, however, the deputy district attorney states:

That your affiant had had available the testimony of several other witnesses including Sergeant Richard Putnam and Deputy Gordon Jenkins of the Washoe County Sheriff's Office. It was your affiant's intention to present these witnesses if the targets of the Grand Jury testified inconsistently with the statements they had given these officers. These witnesses were available for the Grand Jury on March 26 and would have been made available to the Grand Jury on April 10. These and other witnesses, as well as the targets, were not sent away until the Grand Jury indicated they were finished with receiving evidence for the day. Your affiant was further aware that the office of Sergeant Putnam and Deputy Jenkins is in the courthouse building and that even if the Grand Jury had changed their minds and desired more witnesses on the 26th and wished to go further behind schedule, they would have been available for testimony.
[6] NRS 172.097(1) provides that "[t]he district judge impaneling a grand jury shall supervise its proceedings." Respondent Schouweiler impaneled and supervised the grand jury that heard this case in 1986. Apparently because respondent Judge Wright is the present Chief Judge of the Second Judicial District Court, she signed the order as the person responsible for supervision of the grand jury currently impaneled.
[7] The challenged order of the district court recites:

The Court ten (10) days ago, requested that Judith Ann Schonlau provide the Court with a transcript of the Grand Jury proceedings, conveying to her the urgency of the request and the need for prompt action on her part. The Court has still not received the transcript.
Thus, although some 22 months had elapsed following the hearing, ten days after the demand by the district court the transcript had not been supplied.
[8] NRAP 21(a) requires that petitions for extraordinary relief be accompanied by "copies of any order or opinion or parts of the record which may be essential to an understanding of the matters set forth in the petition."
[9] Although this supplemental order was entered approximately five hours prior to the filing of petitioner's petition for extraordinary relief, at no time has petitioner advised this court of the entry of this order, as required by NRAP 21(a). See note 8, supra. Rather, this order was first brought to this court's attention by respondent Judge Schouweiler in his opposition to petitioner's motion for reconsideration or rehearing. Despite this, petitioner failed to file a reply to the opposition and address this supplemental order.
[10] Additionally, we refused to accept petitioner's contention that, as long as a district attorney maintained his "qualifications" to hold office under NRS 252.010, i.e., Nevada residency and a license to practice law, he can never be disqualified from proceeding in a particular matter.
[11] NRS 173.065 states:

The judge of the court having jurisdiction may in extreme cases, upon affidavit filed with him of the commission of a crime, require all available evidence to be delivered to the attorney general for prosecution, if the district attorney refuses to prosecute any person for such crime.
[12] NRS 50.090 provides:

In any prosecution for sexual assault or statutory sexual seduction or for assault with intent to commit, attempt to commit or conspiracy to commit either crime, the accused may not present evidence of any previous sexual conduct of the victim of the crime to challenge the victim's credibility as a witness unless the prosecutor has presented evidence or the victim has testified concerning such conduct, or the absence of such conduct, in which case the scope of the accused's cross-examination of the victim or rebuttal shall be limited to the evidence presented by the prosecutor or victim.
NRS 175.186 correspondingly restricts jury instructions:
1. In any prosecution for sexual assault or statutory sexual seduction or for an assault with intent to commit, attempt to commit or conspiracy to commit either crime, the term "unchaste character" may not be used with reference to the alleged victim of the crime in any instruction to the jury.
2. In a prosecution for sexual assault or statutory sexual seduction, the court may not give any instructions to the jury to the effect that it is difficult to prove or establish the crime beyond a reasonable doubt.
[13] NRS 48.069 provides:

In any prosecution for sexual assault or for assault with intent to commit, attempt to commit or conspiracy to commit a sexual assault, if the accused desires to present evidence of any previous sexual conduct of the victim of the crime to prove the victim's consent:
1. The accused shall first submit to the court a written offer of proof, accompanied by a sworn statement of the specific facts that he expects to prove and pointing out the relevance of the facts to the issue of the victim's consent.
2. If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the victim regarding the offer of proof.
3. At the conclusion of the hearing, if the court determines that the offered evidence:
(a) Is relevant to the issue of consent; and
(b) Is not required to be excluded under NRS 48.035, the court shall make an order stating what evidence may be introduced by the accused and the nature of the questions which he is permitted to ask. The accused may then present evidence or question the victim pursuant to the order.
[14] NRS 172.145 provides, in part:

1. The grand jury is not bound to hear evidence for the defendant... .
2. If the district attorney is aware of any evidence which will explain away the charge, he shall submit it to the grand jury.
.....
[15] Although the district attorney is precluded from presenting evidence of prior sexual conduct to the grand jury, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires disclosure to the accused, upon request, of such evidence where it is material either to guilt or punishment.
[16] We note that respondent Judge Schouweiler, in his opposition to the petition for rehearing, waives all claims of procedural insufficiency of the rehearing petition. This court is not obliged, however, to accept respondents' tendered waiver.
[1] In Dostert, the circuit court judge, acting on an ex parte contact, concluded that the prosecuting attorney had violated the Code of Professional Responsibility, had evinced an unwillingness to prosecute, and was motivated by "retribution." The court said that when the prosecuting attorney committed ethical violations it was the responsibility of the judge to report the matter to the appropriate state bar committee, and that attorney discipline was the sole responsibility of that committee and the Supreme Court of Appeals of West Virginia. 260 S.E.2d at 285, n. 8. In the instant case the same approach would apply if the district attorney had committed ethical, as opposed to criminal, violations. Moreover, if Judge Schouweiler has abused his judicial office without evidentiary foundation, the district attorney's remedy exists in the filing of a complaint with the commission on judicial discipline.
[1] It is noteworthy that legislatures in other states have expressly provided for the application of rape shield statutes to grand jury proceedings, see Mass. Ann. Laws ch. 233, § 21B (Law. Co-op 1983), and preliminary hearings, see Alaska Stat. § 12.45.045 (1985); N.J. Stat. Ann. § 2A: 84A-32.1-.3 (1976); Va. Code Ann. § 18.2-67.7 (1981). Other courts, in the absence of an express statutory provision, have excluded evidence of prior sexual conduct in the preliminary hearing context under the rape shield statute, see People v. Jordan, 142 Cal. App.3d 628, 191 Cal. Rptr. 218 (1983), or general evidentiary principles, see People v. Makela, 147 Mich. App. 674, 383 N.W.2d 270 (1985).